IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:11-CR-00124-FL-1

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | GOVERNMENT'S RESPONSE IN |
| v. | ) | OPPOSITION TO DEFENDANT'S |
| | ) | MOTION FOR COMPASSIONATE |
| DEMECO LAMONT RICHARDSON, | ) | RELEASE [D.E.76] |
| | ) | |
| Defendant. | ) | |

Defendant Demeco Lamont Richardson ("Defendant") has filed a motion with this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release due to the threat posed by the COVID-19 pandemic. [D.E. 76]. The United States respectfully opposes his motion. This Court should deny the motion with prejudice because Defendant has not met his burden to show that a reduction is warranted in light of the relevant § 3553(a) factors and the danger Defendant would pose to the community given his significant criminal history and demonstrated inability to abide by conditions of community supervision. For these reasons, Defendant's motion should be denied.

## FACTS AND PROCEDURAL HISTORY

On July 16, 2016, Defendant pled guilty to one count of Possession with Intent to Distribute a Quantity of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1), and one count of Possession of a Firearm During a Drug Trafficking Crime, in violation of 18 U.S.C. §924(c). [D.E. 26]. According to the Presentence Investigation Report ("PSR"), these offenses occurred on April 29, 2010. Upon receiving information

1

Defendant was selling narcotics from his residence, the Roanoke Rapids Police Department obtained a search warrant. [D.E. 27 at ¶4]. When law enforcement approached Defendant's residence to execute the search warrant, Defendant

> and another individual were on the front porch smoking marijuana. When [Defendant] saw officers approaching his residence, [Defendant] attempted to run from the scene. Officers tackled [Defendant] and a struggle ensued during which [Defendant] refused to let officers see his hands. [Defendant] also placed a plastic bag in his mouth during the struggle. As a result, officers were forced to use a taser on [Defendant] which caused the bag to fall out of his mouth. The bag contained 3.8 grams of cocaine base. During a subsequent search of [his] residence, officers located a loaded .25 caliber pistol, a loaded .22 caliber pistol, 2 bags of marijuana (1.3 grams), 2 marijuana plants, 8 rounds of .380 ammunition, and drug paraphernalia.

Id.

On October 25, 2012, the Court sentenced Defendant to a total term of imprisonment of 211 months. [D.E. 32]. Although the United States Probation calculated Defendant's range of imprisonment under the United States Sentencing Guidelines ("U.S.S.G.") as 33 to 41 months [D.E. 27 at ¶56], the Court upwardly departed to an imprisonment range of 151 to 188 months after concluding Defendant was a *de facto* career offender under U.S.S.G. Section 4B1.3. [D.E. 32]. The Court imposed a sentence of 151 months for Count One to be served consecutively with the mandatory 60 months' imprisonment for Count Two. Id. At the time, the Court was aware Defendant had a family history of heart disease, suffered "a drug-induced heart attack" seven years earlier, undergone five bypass surgeries, took multiple medications, and was deemed 100 percent disabled. [D.E. 27 at ¶31; D.E. 39 at 11-15]. The Court nevertheless rejected Defendant's claim that "the combination of his

age and his heart condition anything more than ten years would be really excessive in his case." [D.E. 39 at 19].

On October 11, 2013, the United States Court of Appeals for the Fourth Circuit affirmed the Court's actions. [D.E. 41]. The Fourth Circuit agreed the sentence was reasonable given Defendant's criminal history, gang affiliation and lack of significant work history. Id.

On June 10, 2015, Defendant filed a Motion to Reduce his sentence, pursuant to 18 U.S.C. § 3582(c)(2). [D.E. 44]. Among other grounds, Defendant pleaded with the Court to reconsider his heart ailments when determining whether to exercise its discretion and reduce his sentence. Id. at 4. Defendant claimed his "heart condition ha[d] intensified beneath the stress of incarceration present in the general environ of correctional custody." Id. Defendant attached medical records and explained there was a "very real chance, as the doctors have diagnosed 18 months of life span, he may not live to complete the length of the imposed term of imprisonment without sentencing relief." Id. The following year, he filed a Motion to Vacate under 18 U.S.C. § 2255, seeking sentencing relief based, in part, on his heart condition and short life span. [D.E. 46]. On December 19, 2016, the Court denied both these Motions. [D.E. 71].

On September 2, 2020, Defendant filed a pro se motion asking this Court for compassionate release in light of the COVID-19 virus. [D.E. 73]. On the same day, the Court appointed Defendant counsel. [D.E. 74]. Defense counsel filed a motion for compassionate release on November 12, 2020, stating his heart condition and obesity
3

put him at a higher risk of suffering severe illness from the COVID-19 virus. [D.E. 76]. He seeks a reduction of his sentence to time served. Id. at 1. He intends to live with his girlfriend, in Virginia. Id.

Defendant is 41 years old and serving his sentence at the United States Penitentiary in Tucson, Arizona with a release date of December 23, 2026. See [https://www.bop.gov/inmateloc/; Number 98953-004; last visited November 25, 2020]. It appears the Warden denied Defendant's request for compassionate release on October 7, 2020. [D.E. 73-1]. Thus, Defendant has exhausted his administrative requirements.

**A. BOP's Response to the COVID-19 Pandemic**

As this Court is well-aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, the Bureau of Prisons ("BOP") has taken significant measures to protect the health of the inmates in its charge. In February 2020, BOP "began planning for its COVID-19 response and instituted a comprehensive management approach for oversight of the situation" that "includes all BOP Regional Offices, all BOP Central Office Divisions (which oversee program level functions), and the National Institute of Corrections (NIC) that coordinates with state and local prisons and jails." https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_response (last accessed November 25, 2020). Along with implementing "its approved Pandemic Influenza Plan," BOP is "utilizing the guidance and directives from the World Health

4

Organization (WHO), the Centers for Disease Control (CDC), the Office of Personnel Management (OP), DOJ and the Office of the Vice President." Id. Like many other government agencies, BOP is conducting "daily briefings and provid[ing] updates to senior management" to implement evolving guidance on matters including "inmate and staff screening tools," "CDC best practices," and "BOP's Personal Protective Equipment (PPE) inventory." Id. Regarding PPE, BOP has completed review of its infectious disease supplies and is executing "[a] national acquisition plan … to obtain bulk purchase, stockpile supplies and coordinate distribution." Id.

BOP has also implemented a modified operations plan to mitigate the spread of the coronavirus. https://www.bop.gov/coronavirus/covid19_status.jsp. Under this plan, all social visits and inmate internal movements were suspended, with the exception of movements required by the federal judicial system or needed to maintain the health and safety of inmates by, for example, limiting overcrowding. Id. In-person legal visits were also temporarily suspended, with allowances for confidential legal calls. Id. Very recently, BOP reinstated social and legal visits where possible to maintain the safety of staff, inmates, visitors, and communities. Id. Each institution is making plans consistent with their institutional resources. Id.

Inmates have also been given an additional 500 telephone minutes per calendar month to facilitate safe social contact. Id. BOP has implemented screening measures for staff, inmates, and contractors performing essential services and maintenance and has adopted a "modified operations plan to maximize social distancing in [its] facilities, as much as practicable." Id. For example, modified

5

operations can included staggered meal and recreation times designed "to limit congregate gatherings." Id. BOP has also suspended all non-essential staff training and all staff travel, excepting relocation travel. Id. BOP is also monitoring and reporting daily on COVID-19 cases identified in its facilities.

While it is certainly true that BOP—like nearly every community— is affected by the spread of the coronavirus, it does not follow that inmates are necessarily at greater risk than members of the general public. BOP has implemented significant protective measures and, through increased use of home confinement and continued evaluation of compassionate release, is actively seeking to remove the most vulnerable and least dangerous to safer alternative settings. Regardless of whether a particular inmate is released under these programs, BOP's efforts to curb the spread of disease will only serve to better protect the health of all federal inmates to the extent reasonably possible amid this pandemic.

## ARGUMENT

### A. Legal Standard

A defendant who seeks compassionate release under 18 U.S.C. § 3582(c) bears the burden of establishing that such relief is warranted. See, e.g., United States v. Mangarella, No. 3:06-cr-151, 2020 WL 1291835, at *2 (W.D.N.C. Mar. 16, 2020); United States v. Mattingly, No. 6:15-cr-5, 2020 WL 974874, at *2 (W.D.Va. Feb. 28, 2020). "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Moreover, "a

6

Case 4:11-cr-00124-FL Document 81 Filed 11/27/20 Page 6 of 19

compassionate release . . . is an extraordinary and rare event." Mangarella, at *2 (quoting White v. United States, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019)).

The First Step Act went into effect on December 21, 2018. See First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. Prior to the passage of the First Step Act, only BOP Director could file a motion for compassionate release. Section 603(b) of the First Step Act modified 18 U.S.C. § 3582(c)(1)(A), however, with the intent of "increasing the use and transparency of compassionate release." Pub. L. No. 115-391, 132 Stat. 5194, at *5239 (capitalization omitted). That section now provides that a sentencing court may modify a sentence of imprisonment either upon a motion of BOP Director "or upon motion of the defendant after [he] has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility...." 18 U.S.C. § 3582(c)(1)(A); see also 28 C.F.R. § 571.60 ("Under 18 U.S.C. § 3582(c)(1)(A), a sentencing court…may reduce the term of imprisonment of an inmate….") (emphasis added).

Defendant moves for compassionate release pursuant to Section 3582(c)(1)(A)(i), which permits a sentencing court to grant such a motion to modify a term of imprisonment where "extraordinary and compelling reasons warrant such a reduction" and the "reduction is consistent with applicable policy statements issued by the Sentencing Commission...." 18 U.S.C. § 3582(c)(1); see also United States v. Overcash, 2019 WL 1472104 *2 (W.D.N.C. Apr. 3, 2019). The statute does not define what constitutes "extraordinary and compelling reasons." Instead, "28 U.S.C. § 994

authorizes the United States Sentencing Commission to define 'extraordinary and compelling reasons.'" United States v. Handerhan, 2019 WL 1437903 *1 (M.D. Pa. Apr. 1, 2019).

The Sentencing Commission has defined "extraordinary and compelling reasons" in Application Note 1 to U.S.S.G. Section 1B1.13. These reasons include:

(A) <u>Medical Condition of the Defendant</u>.

    (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specified time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii) The defendant is

        (I) suffering from a serious physical or medical condition,

        (II) suffering from a serious functional or cognitive impairment, or

        (III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) <u>Age of the Defendant</u>. The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) <u>Family Circumstances</u>.

    (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) <u>Other Reasons</u>. As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13, app. 1.[1]

While the First Step Act removed BOP as an impediment for seeking compassionate release from the Court, it did not create two different standards of review between the Court and BOP when considering the criteria for compassionate release. <u>See</u> <u>United States v. Fox</u>, 2019 WL 3046086, at *3 (D. Maine July 11, 2019) (district court's consideration of what constitutes extraordinary and compelling reasons should be comparable or analogous to what the Commission has already articulated as criteria for compassionate release). In fact, Congress specifically instructed that such decisions must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1).

---

[1] Assuming, arguendo, no such definitions existed, "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979); <u>see</u> <u>also</u> <u>Smith v. United States</u>, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."). "Although not dispositive, dictionary definitions are 'valuable tools' for approximating the sense in which a linguistic community uses and understands a word and for confirming that an understanding taken as ordinary is not, in fact, idiosyncratic." <u>Struniak v. Lynch</u>, 159 F. Supp. 3d 643, 653 n.11 (E.D. Va. 2016). Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common". *Extraordinary*, Black's Law Dictionary (11th ed. 2019). Although it does not define "compelling", Black's Law Dictionary defines "compelling need" as one "so great that irreparable harm or injustice would result if it is not met." *Compelling Need*, Black's Law Dictionary (11th ed. 2019).

In fulfilling its duty to review compassionate release cases, BOP has generally restricted application of 18 U.S.C. § 3582(c)(1)(A) to inmates who have been diagnosed with medical conditions that are terminal within one year, who suffer from severely debilitating and irreversible conditions that render them unable to provide self-care, who are of advanced age, and who need to care for family members otherwise unable to receive needed care. Williams v. Van Buren, 117 Fed. Appx. 985, 987 (5th Cir. 2004). See Leja v. Sabol, 487 F. Supp. 2d 1, 3 (D. Mass. 2007) (BOP determined that chronic, nonlife-threatening conditions do not qualify for compassionate release); BOP Program Statement § 5050.50.

## B. Practical and Legal Backdrop

The novel coronavirus is spreading broadly among the U.S. population, including among members of the public, health-providers, law-enforcement officers, people who produce and deliver essential products, and those who carry out the functions of the federal, state, and local government. Both because of illness and efforts to avoid having people become infected, the coronavirus pandemic is limiting the functions of essential businesses and government. Against that backdrop, Defendant seeks to be released from prison under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i).

BOP is actively working on the critical problem of containing the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, begun providing

masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act. This last step carries special importance for Defendant's request for compassionate release.

Before the CARES Act was passed, § 3624(c)(2) provided BOP with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." Congress has now, temporarily, expanded this provision, while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) suspends, during the emergency of the coronavirus pandemic, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or six months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[2] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

Since March 26, 2020 up to now, BOP has placed an additional 17,913 inmates on home confinement, see [https://www.bop.gov/coronavirus/index.jsp, last visited on

---

[2] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

11

November 25, 2020], focusing on, among other factors, the vulnerability of the inmates, the prisons most at risk, and the dangers posed by the inmates if released.

BOP's releases of inmates to home confinement must take into account, among other factors, whether a home is available where the inmate could be confined, whether the inmate could receive appropriate food and medical care there, the comparative risk to the inmate in home confinement in the identified location versus remaining in prison, the inmate's risk to the public through recidivism, and the availability of supervision during home confinement or risk to the public if supervision is lacking. BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful. To help accomplish that goal, BOP is requiring a 14-day period of quarantine before any inmate is released to home confinement. By having BOP control the 14-day period of quarantine—rather than leaving inmates to conduct their own quarantines after release—BOP can ensure the effectiveness of the quarantine and evaluate the appropriateness of any determination that the inmate is not a carrier of the coronavirus.

In addition to these efforts to increase the use of home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—Defendant envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts. And critically, under Defendant's approach, courts must attempt to assess facts that can change within days—if not hours—when many of the changing circumstances could nullify the intended goal of any court order.

Under the present circumstances, courts are not well positioned to:

- determine whether an inmate's proposed place to go after release from prison is a place where no person is infected or soon to be infected;

- evaluate with the stretched resources of BOP and the Probation Office whether the place where a defendant would go after release from prison is suitable in enabling a defendant to avoid reoffending and returning to prison—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12;

- assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- appropriately triage the use of available testing by medical need, not by an unsystematic series of court orders;

- evaluate whether a released inmate could find—during a pandemic—food, medical care, and safe (often interstate) transportation needed to relocate from prison to the inmate's home;

- determine the extent to which an inmate's relief makes a difference to disease transmission in one of the 30 BOP facilities and 6 residential

reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- balance how likely an inmate's release will improve his health prospects against the likelihood that continued incarceration would affect the same inmate's health;

- determine accurately, with appropriate records, how great a danger the inmate poses to the public and make that determination on a time scale needed to respond to disease transmission within a prison; and

- compare the improvement in prison conditions and risk to the public of this inmate's release versus releasing another inmate who could use the resources available for post-imprisonment supervision.

To avoid a mass release of inmates that has a serious, negative effect on public welfare, the Court would also have to take into account the risk to probation officers, police officers, and others who must immediately cope with and supervise released inmates.

This list is not exhaustive and, indeed, could include many additional considerations. The point is that the factors cited above illustrate a general truth—there are no known examples of effectively litigating out of a crisis by taking up thousands of cases simultaneously in hundreds of courtrooms across the country and attempting to have the judicial process evaluate prisoner releases in a pandemic that changes daily and even hourly.

BOP has a massively important task ahead of it. Layering the burdens of a huge volume of emergency litigation on top of the difficult challenges that the pandemic has handed BOP is unhelpful. And it is likely to incentivize a counterproductive race to the courthouse in countless cases—a race that will necessarily require this Court to mete out limited re-entry and supervision resources

on a first-come-first-serve basis that favors defendants who flout the administrative processes in place to prioritize release for the most vulnerable and least dangerous.

The above points inform the legal framework discussed below.

I. **DEFENDANT'S SENTENCE SHOULD REMAIN THE SAME BASED ON THE TOTALITY OF THE CIRCUMSTANCES.**

At the present time, it is apparent that, but for the COVID-19 pandemic, Defendant would present no basis for compassionate release. His medical ailments are not terminal and do not present any impediment to his ability to provide self-care in the institution. The only question, then, is whether the risk of COVID-19 changes that assessment. The United States acknowledges that Defendant presents risk factors (heart disease and obesity) identified by the CDC as heightening the risk of severe injury or death were the inmate to contract COVID-19.[3] The United States agrees that these health conditions present "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in § 1B1.13, cmt. n. 1(A)(ii), in that at this time the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the chronic condition itself.

However, Defendant is not entitled to relief. This Court must consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. At present, Defendant's medical conditions can be appropriately

---

[3] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions. (last accessed November 25, 2020).

managed at the facility. Notably, the medical records provided by Defendant show BOP has effectively treated and managed Defendant's serious health conditions since his incarceration in 2012. According to Defendant, in 2013, his life expectancy was only 18 months. Yet, given BOP's care, he is still alive and able to care for himself.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines Defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. See § 3582(c)(1)(A); United States v. Chambliss, 948 F.3d 691, 694 (5th Cir. 2020). Among the § 3553(a) factors, a court is to consider i) the nature and circumstances of the offense and history and characteristics of the defendant, ii) the need for the sentence of the offense to promote respect for the law and provide just punishment, and iii) the need for the sentence imposed to provide the defendant with needed medical care. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A) and (D).

Defendant would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone. Defendant was properly categorized as a *de facto* career offender, having trafficked in illegal narcotics his entire adult life. Defendant possessed firearms and committed various acts of violence, including assault on a child and threatening to kill witnesses in a pending case. [D.E. 27 at ¶¶ 9, 12 and 19]. His serious and dangerous criminal conduct continued even after he suffered a heart attack and underwent multiple surgical procedures to manage coronary disease. Further, his adjustment to community supervision was extremely
16

poor. Terms of probation were repeatedly revoked for failure to abide by conditions, including absconding, failing to pay monetary obligations and committing new criminal conduct. Id. at ¶¶ 9-11, 13, 14. Upon review of his appalling record even after periods of incarceration, the Court concluded Defendant had "absolutely no intention of changing his ways," [D.E. 39 at 12]., and therefore, found the risk of recidivism was high. The sentence imposed was necessary, and continues to be necessary, to protect society from Defendant.

In addition, to reduce Defendant's sentence to any degree would minimize the scope of Defendant's criminal activity. Moreover, considering Defendant's propensity to commit crimes based on his criminal history and history of violence, reducing his sentence would fail to afford adequate deterrence to commit criminal conduct by him and others. Therefore, under the § 3553(a) factors, Defendant's motion should be denied. See, e.g., United States v. Chambliss, 948 F.3d 691, 694 (5th Cir. 2020) (district court did not err in denying compassionate release motion based on § 3553(a) factors).

## II. CONDITIONS OF ANY RELEASE GRANTED

For all the reasons stated herein and at sentencing, the Court should not grant Defendant's motion for compassionate release. Defendant's release would not occur in a vacuum, but rather against the backdrop of significant practical and legal challenges. Without waiving or conceding its arguments against release, the United States nevertheless requests that, if the Court concludes that release is warranted under § 3582(c)(1)(A), it order Defendant to serve the remainder of his sentence on

17

home incarceration with electronic monitoring, if he so qualifies. Additionally, any release order should require Defendant to submit to a 14-day quarantine period, administered by BOP, to mitigate his unknowing exposure of others to the coronavirus.

## CONCLUSION

For all the reasons stated herein and at sentencing, the Court should deny Defendant's motion for compassionate release.

Respectfully submitted this 27th day of November 2020.

                        ROBERT J. HIGDON, JR.
                        United States Attorney


                        BY: /s/ Susan B. Menzer
                        SUSAN B. MENZER
                        Assistant United States Attorney
                        150 Fayetteville Street, Suite 2100
                        Raleigh, NC 27601
                        Telephone: (919) 856-4099
                        Email: susan.menzer@usdoj.gov
                        D.C. Bar # 421007

**CERTIFICATE OF SERVICE**

I do hereby certify that I have this 27th day of November 2020, served a copy of the foregoing upon the below-listed party by electronically filing the foregoing with the Court on this date using the CM/ECF system to the following:

Halerie M. Costello
Counsel for Defendant

                        ROBERT J. HIGDON, JR.
                        United States Attorney

BY:   /s/ Susan B. Menzer
        SUSAN B. MENZER
        Assistant United States Attorney
        150 Fayetteville Street, Suite 2100
        Raleigh, NC 27601
        Telephone: (919) 856-4099
        Email: susan.menzer@usdoj.gov
        D.C. Bar # 421007